RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 14a0267p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

BRADEN FRIEDER,

> *Plaintiff-Appellant,*

*v.*

MOREHEAD STATE UNIVERSITY, et al.,

> *Defendants-Appellees.*

No. 13-6595

---

Appeal from the United States District Court
for the Eastern District of Kentucky at Ashland.
No. 0:11-cv-00127—Henry R. Wilhoit, Jr., District Judge.

Argued:  October 10, 2014

Decided and Filed:  October 24, 2014

Before:  BOGGS, SUTTON, and STRANCH, Circuit Judges.

---

### COUNSEL

**ON BRIEF:**  Edward Dove, Lexington, Kentucky, for Appellant.  Katherine M. Coleman, Joshua M. Salsburey, STURGILL, TURNER & MOLONEY PLLC, Lexington, Kentucky, Jane V. Fitzpatrick, MOREHEAD STATE UNIVERSITY, Morehead, Kentucky, for Appellees.

---

### OPINION

---

SUTTON, Circuit Judge.  Braden Frieder, a tenure-track professor, was denied tenure. We affirm the district court's conclusion that the denial was neither retaliation against speech (his "idiosyncratic teaching methods") nor discrimination against disability (his undisclosed diagnosis for bipolar disorder).

1

Braden Frieder joined Morehead State University in 2006 as an assistant professor of art history. Frieder lacked tenure but expected to receive it after a period of "probation" followed by a faculty vote. Probation in Morehead State's art department involves annual evaluations of each tenure-track professor in teaching, professional achievement, and service to the university. These evaluations go on for up to six years, after which the tenured department faculty, dean, provost, university tenure committee, and president each weigh in on whether the professor should receive tenure.

During his stint in probation, Frieder excelled in professional achievement and service but had difficulty teaching. The reviews of his introductory art history class were consistently abysmal: In spring 2008, for instance, students rated his course in the lowest 10 or 20 percent of classes for "Excellence of Course" and "Excellence of Teacher." *See* R. 32-14 at 2. Frieder's evaluators suggested improvements—asking Frieder to observe other teachers or visit the "Center for Teaching & Learning"—but the advice did not stick. *See, e.g.*, R. 32-12 at 1. In 2010, after four years of renewing Frieder's contract, the evaluators voted against tenure and the provost and president agreed.

Frieder sued the university and various administrators in state court for violating the First Amendment and a Kentucky statute that prohibits disability-based discrimination, Ky. Rev. Stat. § 344.040. In his First Amendment claim, Frieder argued that his evaluators retaliated against his "idiosyncratic teaching methods," which allegedly involved context-appropriate uses of the middle finger. In his disability claim, Frieder alleged that the tenure decision stemmed from his diagnosis of bipolar disorder, which he admits his evaluators knew nothing about. After the defendants removed the case to federal court, the district court granted the defendants summary judgment on both claims, holding that neither protected speech nor perceptions of a disability motivated the decision.

*Jurisdiction.* On appeal, the administrators raise a challenge to our jurisdiction that we must address first. After Frieder lost in district court, he filed a notice of appeal as required by Rule 3 of the Federal Rules of Appellate Procedure. The document gave "Notice to the Defendant, Morehead State University," of Frieder's intent to appeal. R. 41. The administrator

defendants claim that, because they were not individually listed in the document, they did not receive notice.  As a result, they insist, we possess jurisdiction over only the university.

The administrators appear to have read Frieder's notice more carefully than they read Rule 3.  Although the specifications of Rule 3 are jurisdictional, *Smith v. Barry*, 502 U.S. 244, 248 (1992), the Rule does not require an appellant to list any appellee's name.  It tells a prospective appellant only to "specify the party or parties taking the appeal," to "designate the judgment, order, or part thereof being appealed," and to "name the court to which the appeal is taken."  Fed. R. App. P. 3(c)(1).  The person required to notify the appellees is not the appellant but the district clerk.  *Id.*  3(d)(1).  Even if the clerk fails in this duty (which no one contends happened here), the "failure to serve notice does not affect the validity of the appeal."  *Id.* 3(d)(3).  Frieder complied with Rule 3, and we have jurisdiction over all of the defendants.

*The First Amendment claim.*  In a claim for retaliation against free speech, we ask whether an individual's exercise of constitutionally protected speech was a "motivating factor" behind retaliatory government conduct.  *See Evans-Marshall v. Bd. of Educ.*, 624 F.3d 332, 337 (6th Cir. 2010).  Frieder alleges that his "idiosyncratic teaching methods" motivated this state university's adverse tenure decision.  Appellant Br. at 11.  Frieder is not the first plaintiff to ask us to "convert the vague, inclusive term 'teaching methods' into a specific, protected form of speech that cannot be considered by a school administration in determining whether a nontentured teacher should be renewed."  *Hetrick v. Martin*, 480 F.2d 705, 709 (6th Cir. 1973). We have held early and often that a "university may constitutionally choose not to renew the contract of a nontenured professor whose pedagogical attitude and teaching methods do not conform to institutional standards."  *Parate v. Isibor*, 868 F.2d 821, 827 (6th Cir. 1989) (quoting *Hetrick*, 480 F.2d at 708); *see also, e.g.*, *Johnson-Kurek v. Abu-Absi*, 423 F.3d 590, 595 (6th Cir. 2005). "Teaching methods" in other words are not constitutionally protected, requiring Frieder to offer a more specific example of speech that allegedly motivated the university's decision.

To meet this requirement, Frieder shows us "the bird."  He tells us that he once extended his middle finger to his students during a lesson about a painter who used birds as symbols of sexual sin.  This gesture not only raised eyebrows, but it also raised "a matter of legitimate

public concern," he says. *Pickering v. Bd. of Educ.*, 391 U.S. 563, 571 (1968); *see also Hardy v. Jefferson Cmty. Coll.*, 260 F.3d 671, 679 (6th Cir. 2001).

Even if we assume for the sake of argument and against our better judgment that the Constitution protects Frieder's one-finger salute in this instance, a free speech retaliation claim still requires *retaliation*—a showing that his gesture motivated the university's tenure decision. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). The record, however, reveals "little about the sequence of events leading up to the decision that would spark suspicion." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 269 (1977). While concerns about Frieder's course reviews appear throughout his probationary evaluations, this one feature of his teaching style never makes an appearance.

No evidence shows that anything other than his poor student ratings and disorganization motivated the tenure decision. Frieder was not disciplined for the bird incident. Nor was he told not to flip off students in the future. At most, the department chair independently advised Frieder to use his "professional judgment" when teaching. R. 32-36 at 29. Yet a "nontenured professor does not escape reasonable supervision in the manner in which she conducts her classes" by virtue of the First Amendment. *Parate*, 868 F.2d at 827.

*The discrimination claim.* Frieder's discrimination claim fares no better. Kentucky law forbids any employer from discriminating against an employee with respect to terms of employment because the employee is regarded as having a mental impairment. Ky. Rev. Stat. §§ 344.010(4), 344.030(1), 344.040(1)(a). Although Frieder was diagnosed in 2006 with bipolar disorder, he admits that he has no evidence that anyone involved in his tenure decision knew of the diagnosis. He also lacks evidence that anyone regarded him as having a disability, other than his evaluators' criticisms of his disorganization. But, as the district court recognized, this is not evidence that "he was perceived as disabled, only that he was perceived as not effective at his job." R. 39 at 14. In the absence of evidence that this criticism of his work product stemmed from a perception of an undisclosed disability, the district court correctly granted summary judgment to the university.

For these reasons, we affirm.